Cooke, J.
Petitioners Eleanor Baumes, Loretta Brown and Claudine Ravenna, recipients of public assistance in Albany County in the aid to dependent children category, bring this article 78 proceeding on behalf of themselves and on behalf of all others similarly situated, pursuant to CPLR 1005 (subd [a]), to establish as a matter of law that section 350-j of the Social Services Law, entitled "Emergency assistance to needy families with children”, is applicable to families receiving public assistance whose children are without essential furniture, particularly beds, resulting solely from the deterioration of previously available furniture.

Individual Petitioners

As of the date of the petition, Eleanor Baumes, receiving as *299 her only income the sum of $123.25 semimonthly from Albany County Department of Social Services, was presented with the choice of sleeping on a "worn-out sofa bed” or sharing the family’s one good bed with her 13-year-old son. Ill health necessitating the former, on May 2, 1973, she submitted to Albany County a written request for replacement of the sofa bed pursuant to section 350-j of the Social Services Law. Without investigation as to need, the application was denied on May 4,1973.
Petitioner Loretta Brown, resides in Albany County together with her two sons and daughter, ages 15, 12 and 3. Because she was unable, at the time of the petition, to purchase beds from her regular semimonthly grant of $169 her 15-year-old son sleeps in a bed temporarily borrowed from her landlady, while her 12 year old sleeps on the floor.
Petitioner Claudine Ravenna is similarly troubled. Residing with four minor children, ages 17, 14, 12 and 4, and an adult daughter, age 21, she finds herself sharing a bed with her 14-year-old daughter while her 12-year-old son must share his with his 4-year-old brother. Although she receives $170 semimonthly, she finds she cannot afford to purchase either additional beds or other items of furniture to replace those which deteriorated and were subsequently discarded.
Petitioners Brown and Ravenna, like petitioner Baumes, requested furniture pursuant to section 350-j. While it is alleged that Albany County never responded to petitioner Ravenna’s request, the response petitioner Brown received did not indicate whether emergency assistance would be considered, but instead directed the service worker to explore "such avenues as community resources”. The three petitioners allege that they have been recipients of public assistance for extended periods of time but have been unable to accumulate savings from their regular assistance grants to provide for replacement of deteriorating furniture. They assert that, as a result of assistance payments set at the time of the petition at 90% of need and as a further result of inflation and increased food prices, "any sums in their grants which are purported to meet furniture needs have been utilized and 'diverted’ for essentials, particularly food and clothing.” Without special provisions, they contend, it is impossible for them to meet their family’s basic furniture needs.

Analysis

For many years, the New York State Department of Social *300 Services, pursuant to the general grant of authority contained in section 131 of the Social Services Law (formerly Social Welfare Law) established, administratively, items of basic need and levels of payment of assistance. Former 18 NYCRR 352.4 provided for items of basic maintenance, exclusive of shelter, while former 18 NYCRR 352.5 covered items of special need, to be afforded when special circumstances were found to exist. The need for furniture was deemed a special one, and 18 NYCRR 352.5 (j) provided in part that: "The cost of essential equipment and supplies for the home shall be met for the initial provision, replacement or repair of essential items such as bedding, towels, dishes, utensils and essential articles of household furniture and furnishings, when such items have worn out, been destroyed by fire, flood or other disaster, or when an initial supply is required.”
Thus, in times prior to July 1, 1969, caseworkers, as part of their job routine, were required to process under this regulation requests, not only for replacement and repair of furniture but of bedding, towels, dishes and utensils as well. In 1969, by chapter 184 of the Laws of 1969, effective July 1, 1969, section 131-a of the Social Services Law was enacted. It functioned to set levels of payment legislatively, rather than administratively, eliminating most special grants, including special grants for replacement of household furniture.
The statement of legislative findings of chapter 184 is enlightening:
"The present procedure for establishing the monthly grant and allowance, based upon various factors, has been criticized as arbitrary, confusing, complicated and time-consuming for social services personnel and allegedly resulting in a lack of uniformity and uneven treátment of the recipients of public assistance throughout the state.
"A uniform schedule of monthly grants and allowances will promote greater uniformity and equality of treatment of the recipients of public assistance, meet the needs of our less fortunate citizens and simplify and reduce the administrative detail. This will release caseworkers for the more important task of providing casework services to restore recipients to the dignity of selfsufficiency.
"The legislature therefore finds and declares that it is necessary and in the best interests of the people of the state to establish a schedule of maximum monthly grants”.
*301 Accordingly, subdivision 1 of section 131-a, as originally enacted, stated: "1. Any inconsistent provision of this chapter or other law notwithstanding, social services officials shall provide home relief, veteran assistance, old age assistance, assistance to the blind, aid to the disabled and aid to dependent children, to eligible needy persons who constitute or are members of a family household, in monthly or semi-monthly allowances or grants in accordance with standards established by the regulations of the department, but not in excess of the schedules included in this section, less any available income or resources which are not required to be disregarded by other provisions of this chapter. Such schedules shall be deemed to make adequate provision for all items of need in accordance with the provisions of section one hundred thirty-one, exclusive of shelter and fuel for heating, for which two items additional provision shall be made by the social services districts in accordance with the regulations of the department.” (Emphasis supplied.) Further, in subdivision 6 thereof, we find: "6. Notwithstanding any other provisions of this chapter or other law, a social services official may make provision for the replacement of necessary furniture and clothing for persons in need of public assistance who have suffered the loss of such items as the result of fire, flood or other like catastrophe, provided provision therefor cannot otherwise be made.” Although subsequently amended, the tenor of section 131-a has remained basically the same. (See L 1970, ch 517, § 3, as amd by: L 1971, ch 110, § 15; L 1971, ch 133, § 2; L 1971, ch 298, § 3; L 1971, ch 737; L 1972, ch 523, § 1; L 1972, ch 943, § 1; L 1973, ch 150, § 1; L 1973, ch 516, § 1; L 1974, ch 189, §§ 1, 2; L 1974, ch 1080, §§ 10, 11.)
In the first instance, pursuant to 18 NYCRR 352.7 (a) (2), promulgated under the statutory authority of section 131-a, furniture will be provided under the following or similar circumstances: "(i) A family who is residing in a motel or hotel, and in need of basic furniture, is being rehoused in an unfurnished housing accommodation, (ii) An unattached individual has been discharged from an institution and it is indicated that he resides in an apartment, (iii) A child is returning to his parents and additional furniture is necessary in order to provide adequate shelter for the child, (iv) An adult rejoins his family after discharge from an institution and additional furniture is necessary in order to provide adequate shelter for the family.” Once received, replacement *302 can be had only in accordance with 18 NYCRR 352.7 (d) whereby: "Each social services district shall provide for partial or total replacement of clothing or furniture which has been lost in a fire, flood or other like catastrophe, provided such needs cannot otherwise be met through assistance from relatives or friends or from other agencies or other resources.”
The specific provisions of section 131-a and the regulations established under its authority indicate that this legislation was attempting to meet all foreseeable needs of eligible individuals, including the need for home furnishings. These provisions, coupled with the intent of the Legislature as expressed in its findings, would lead us to believe that the monthly or semimonthly allowances and grants were being given to encourage responsibility and the dignity of self-sufficiency, in part through money management. No longer need the caseworker be asked to submit to the department a request for each and every item requiring replacement. The maximum would be given and, from that, the recipients themselves could make an apportionment.
The Legislature was not unmindful of rising costs and, accordingly, at the time it was enacted, subdivision 5 of section 131-a provided: "In order that the legislature may, from time to time, consider adjustments to reflect changes in the cost of living, the board and the department shall annually make an appropriate report to the governor and the legislature, which report shall include the recommendations of the board and the department relating thereto.” In 1971, the Legislature, responding to a "fiscal crisis of staggering proportions” and under constraint thereof, enacted a 10% ratable reduction from the standard of need for basic monthly grants and allowances established by section 131-a. In its findings, the Legislature noted that while States are not required to set the level of assistance at 100% of the standard of need (Rosado v Wyman, 397 US 397), New York was one of only 14 States to pay this percentage to families with dependent children.
At the time of the relief requests herein, New York, pursuant to the 1971 cutback, was paying only 90% of the standard of need and petitioners cast the blame for their shortness of funds on the lowered amounts of their grants as well as on ever increasing inflation. Since section 131-a afforded them no solution to their furniture problem, as they neither fit within the four categories set forth in 18 NYCRR 352.7 (a) (2) nor came *303 within the fire, flood or other like catastrophe requirement of 18 NYCRR 352.7 (d), petitioners sought a provision that would permit them funds to purchase the furniture they felt otherwise forced to live without. At this point, they turned to the emergency assistance provision of section 350-j of the Social Services Law. Subdivision 3 of section 350-j, in language paralleling that used in section 606 (subd [e], par [1]) of title 42 of the United States Code provides: "Emergency assistance to needy families with children shall be provided in accordance with the regulations of the department for children who are without available resources, and when such assistance is necessary to avoid destitution or to provide them with living arrangements in a home, and such destitution or such need did not arise because such children or relatives refused without good cause to accept employment or training for employment.”
As was reported in the 1968 New York State Legislative Annual (p 255) at the time of its passage, this bill "allows the state and its social services districts to take advantage of federal reimbursement of emergency assistance expenditures to needy families with children now provided by the Social Security Act amendments of 1967 [U. S. Code, tit. 42, § 606, subd. (e), par. (1)]. These federal funds would be available for expenditures made in a great variety of emergency circumstances, including eviction, cut-off of utilities, desertion of children, deprivation of parents by accidental death, and for the expenditures made in an appropriate case where fair hearings have been requested after a discontinuance or suspension of assistance.” The intent expressed therein comports with that expressed in the Senate Report on Bill No. 744 (2 US Code Congressional and Administrative News, vol II, p 3002 [1967]): "The committee understands that the process of determining AFDC eligibility and authorizing payments frequently precludes the meeting of emergency needs when a crisis occurs. In the event of eviction, or when utilities are turned off, or when an alcoholic parent leaves children without food, immediate action is necessary. It frequently is unavailable under State programs today. When a child is suddenly deprived of his parents by their accidental death or when the agency finds that conditions in home are contrary to the child’s welfare, new arrangements and court referrals may have to be made.” (Emphasis supplied.)
Considering the language of the emergency relief provision *304 in light of the expressed intent of its draftspersons, both State and Federal, we cannot say that the situation in which petitioners find themselves is one to which emergency relief would extend. The essence of this aspect of the legislation is captured in the committee’s statement of its goal of prompt assistance payments to meet "emergency needs when a crisis occurs.” A further indication of this intent can be found in the language used in the corresponding regulation (45 CFR 233.120 [a] [4]) which guides the setting of requirements for State plans. In enumerating possible services to be provided by States, the needs to be met by such services are characterized as being those "attributable to the emergency or unusual crisis situation.”
Federally, the temporary emergency assistance is but part of a larger bill "concerned with several major objectives—to assure needed care for children, to focus maximum effort on self-support by families, and to provide more flexible and appropriate tools to accomplish these objectives. The bill broadens the provisions of protective payments, authorizes vendor payments, provides a work-incentive program, expands foster care for children, and makes day care available where needed to children of working parents” (Senate Report on Bill No. 744; 2 U S Code Congressional and Administrative News, vol 11, p 3002 [1967]).
On the State level, emergency assistance also fits within a larger welfare scheme with programs and assistance paralleling Federal. To read the emergency provisions as petitioners would have us do, would be reading against, not in accordance with, the broader stated objectives of family self-support and, predictably, would foster a reversion to special grants and the abolition of the uniform schedule of monthly or semimonthly grants. Rather, we are in accord with the Appellate Division majority view (44 AD2d 336-337): "that section 350-j was enacted to apply to sudden and unexplained emergency events (see N. Y. State Legis. Annual, 1968, p. 255; see, also, Matter of Bates v. Wyman, 36 A D 2d 854; Matter of Borders v. Nassau County Dept. of Social Servs., 34 A D 2d 805; Matter of Ross v. Sipprell, 71 Misc 2d 677, affd. 42 A D 2d 691), and not to remedy the anticipated demands created as the result of everyday life. It was not designed to replace furniture merely worn by normal use such as is the case here, but where emergency or catastrophe suddenly affects the family or individuals involved. To so hold would violate the concept of *305 semimonthly flat grants to welfare recipients and inundate the Department of Social Services with requests for additional assistance to meet the everyday needs for which the vast population, also on fixed incomes, have learned to budget and expect.”
The power to set the level of benefits and the standard of need still rests with the State Legislature (King v Smith, 392 US 309, 318-319), and it is its continuing responsibility to consider and make adjustments to reflect changes in the cost of living, even in the absence of formal reports (see Social Services Law, § 131-a, subd 5, repealed by L 1972, ch 523). Shortly after the institution of this proceeding and effective January 1, 1974, the level of benefits was once again set at 100% of the established standard of need (L 1973, ch 150) while, on July 1, 1974 the standard of need was itself increased approximately 11% (L 1974, ch 189). Circumstances such as those here described are of the type that prompt this constant legislative re-evaluation.
Because it is not relevant to our analysis herein, we will only note in passing the attack mounted against 18 NYCRR 372.2 (b) (c), and mention that in our recent decision of Matter of Jones v Berman (37 NY2d 42), this court found the latter regulation invalid. It is important to note that in Jones the parties proceeded on the assumption that emergency relief pursuant to section 350-j would be available to the petitioners but for the underlying regulation. Most relevant, however, was our holding therein relating to class action relief that "where governmental operations are involved, and where subsequent petitioners will be adequately protected under the principles of stare decisis (Matter of Rivera v. Trimarco, 36 N Y 2d 747), we are of the opinion that class action relief is not necessary” (Matter of Jones v Berman, supra, at p 57).
To uphold the petition would be legally incorrect. Should a different result be desired, the change must come from the Legislature, effected through the reinstitution of special grants or the making of emergency assistance applicable to situations such as these. The order of the Appellate Division should be affirmed.