Jeanne BACON, Individually and on behalf of her minor children Robert Bacon and Ife Bacon, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Philip L. TOIA, Individually and as Commissioner of the Department of Social Services of the State of New York, and Charles W. Bates, Individually and as Commissioner of the Westchester County Department of Social Services, Defendants.

No. 77 Civ. 2823(LPG).

United States District Court,
S. D. New York.

June 23, 1980.

Westchester Legal Services, Inc., White Plains, N. Y., for plaintiffs; Martin A. Schwartz, White Plains, N. Y., of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel.

## MEMORANDUM DECISION

GAGLIARDI, District Judge.

The issue presented by this case, which is before the court on remand from the Second Circuit, is whether three provisions of Section 350–j of the New York Social Service Law ("NYSSL") as amended May 1, 1977 by the New York Laws of 1977, Chapter 77, Section 10 ("the statute")[1] deny plaintiffs equal protection of the law in violation of the Fourteenth Amendment of

---

1. The statute reads in relevant part, as follows:

§ 350–j. Emergency assistance to needy families with children

1. Any inconsistent provisions of this chapter or of any other law notwithstanding, so long as federal aid is available therefor, a social services district shall provide emergency assistance as herein defined to persons eligible, including migrant workers with families.

2. For purposes of this section, the term "emergency assistance" means aid, care and services authorized during a period not in excess of thirty days in any twelve month period to meet the emergency needs of a child or the household in which he is living, in the following circumstances:

(a) where the child is under twenty-one years of age; and

(b) the child is living with, or within the previous six months has lived with, one or more persons specified to subdivision b of section three hundred forty-nine of this chapter; and

(c) in cases of applications for grants of cash assistance, such child or such household is not categorically eligible for or receiving aid to dependent children; and

(d) such emergency needs resulted from a catastrophic occurrence or from a situation which threatens family stability and which has caused the destitution of the child and/or household; and

(e) such occurrence or situation could not have been foreseen by the applicant, was not

under his control and, in the case of a person receiving public assistance, did not result from the loss, theft or mismanagement of a regular public assistance grant; and

(f) the emergency grant being applied for will not replace or duplicate a public assistance grant already made under section one hundred thirty-one-a of this chapter.

3. Emergency assistance to needy families with children shall be provided to the extent of items of need and services set forth in sections one hundred thirty-one-a of this chapter, and items of medical services set forth in section three hundred sixty-five-a of this chapter, and in amounts set forth in the regulations of the department for children who are without available resources, and when such assistance is necessary to avoid destitution or to provide them with living arrangements in a home, and such destitution or such need did not arise because such children or relatives refused without good cause to accept employment or training for employment. Such emergency assistance, but not including cash grants, may be furnished to a family eligible for aid to dependent children only in the form of emergency services, and so long as federal aid remains available, for emergency fuel grants in the form of vendor restricted payments.

The challenged sections are 2(c); 2(e) and 2(f), fully discussed *infra*.

the United States Constitution. Defendants move for summary judgment pursuant to Fed.R.Civ.P. Rule 56. For the reasons which follow, defendants' motion is granted in part and denied in part.

## I Background

Plaintiffs, recipients of public assistance in the form of Aid to Families with Dependent Children ("AFDC") commenced this class action in 1977 on behalf of themselves and other similarly situated AFDC recipients, challenging the validity of the revised eligibility requirements of the emergency assistance program established by the statute. In summary, the statute denies emergency aid 1) in the form of cash to AFDC recipients, 2) in all cases of loss, theft or mismanagement of a public assistance grant and 3) when sought to replace or duplicate a recurring public assistance grant. Defendant Philip Toia, Commissioner of the New York State Department of Social Services, is responsible for the administration of the state public assistance programs. Defendant Charles Bates, Commissioner of the Westchester County Department of Social Services, administers the state programs in that county as agent of the State Commissioner. The complaint alleges that the statute violates the supremacy clause of Article VI and the equal protection and due process clauses of the Fourteenth Amendment. In their supremacy clause challenge, plaintiffs argue that the state statute impermissibly establishes more restrictive eligibility standards than the provision of the Social Security Act defining the emergency aid program. *See*

Section 406(e) of the Social Security Act, 42 U.S.C. § 606(e)(1). Plaintiffs moved for class certification and summary judgment. This court, by decision dated September 29, 1977, certified the class of all potential recipients of emergency aid whose claims would be rejected based on the challenged statutory provisions, granted plaintiffs' motion for summary judgment on the supremacy clause claim and enjoined defendants from enforcing the challenged portions of the statute.[2] *Bacon v. Toia*, 437 F.Supp. 1371 (S.D.N.Y.1977). The Second Circuit affirmed, 580 F.2d 1044 (2d Cir. 1978). Thereafter, on June 6, 1978, the Supreme Court decided in *Quern v. Mandley*, 436 U.S. 725, 98 S.Ct. 2068, 56 L.Ed.2d 658, that a state program which established more restrictive eligibility standards than the federal program was not necessarily invalid or ineligible for federal funding. The Second Circuit then granted defendants' motion for rehearing, recalled its order affirming the decision, vacated the judgment and remanded the case to this court for reconsideration of the supremacy clause issue in light of *Quern*, as well as for resolution of any remaining issues, "if necessary." No. 77–7567 (2d Cir. Aug. 21, 1978). This court granted defendants' motions for reconsideration and for summary judgment on the supremacy clause issue, and requested the parties to brief the constitutional question raised by the New York statute. No. 77–2823 (S.D.N.Y. filed Feb. 1, 1979). The court's analysis of the equal protection claim[3] requires familiarity with the legislative history of the federal and state emergency aid programs, and with the facts

---

**2.** The court analyzed the constitutional issues for jurisdictional purposes only in light of the standards established by *Hagans v. Lavine*, 415 U.S. 528, 536–43, 94 S.Ct. 1372, 1378–1382, 39 L.Ed.2d 577 (1974), concluding that since the constitutional claims were not "completely devoid of merit," the court had jurisdiction under 28 U.S.C. § 1343(3). *Bacon v. Toia, supra*, 437 F.Supp. at 1380, *quoting Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974).

**3.** Plaintiffs allege, in conclusory terms, that the "irrational classifications" violate plaintiffs' rights to equal protection and due process.

The court has focused on the equal protection claim which it deems the appropriate analysis of a challenged classification created by a state welfare scheme. *See Weinberger v. Salfi*, 422 U.S. 749 at 770, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522. Plaintiffs may be asserting that the denial of a hearing or other opportunity to verify certain claims creates an "irrebuttable presumption" in denial of due process. However, the Supreme Court made clear in *Weinberger v. Salfi, supra*, that "irrebuttable presumption" analysis was ordinarily inapplicable to challenges directed at social welfare legislation. *Id.* at 771, 95 S.Ct. at 2469.

giving rise to the instant action. Since the latter are set forth in detail in the court's decision granting plaintiffs relief on the statutory issue, *Bacon v. Toia, supra,* 437 F.Supp. 1371, they are summarized briefly herein.

## II  Legislative History

### A.  The Federal Statute

In 1968, Congress enacted an emergency assistance program ("EA") by amendment to the Social Security Act, Pub.L.No. 90–248, 42 U.S.C. §§ 603(a)(5), 606(e), as part of the AFDC program.[4]  AFDC is one of the major cooperative federal-state categorical aid programs established by the Social Securities Act of 1935. A regulation promulgated under the EA statute provides that the federal government will reimburse 50% of the state's costs in administering an approved program. *See* 45 CFR § 233.-120(b)(2). Although EA was enacted as part of the AFDC program, it is apparent from the legislative history that Congress intended that the new plan would provide expanded coverage in terms of both the kinds of circumstances for which public assistance would be available and the categories of potential recipients. The emphasis was less on enabling states to provide a defined category of recipients with the means of daily subsistence than on encouraging states to respond rapidly in an appropriate manner to meet the immediate requirements of any needy family with de-

pendent children in the event of a catastrophe. *See generally, Quern v. Mandley, supra.* The EA program, unlike AFDC which limits aid to families with an absent parent, provides that low income families with both parents present, including families who do not normally qualify for public assistance, are eligible for emergency assistance in the event of a catastrophe. In addition to broadening the group of potential recipients, EA also offers a different type of assistance. "Unlike the basic AFDC program . . . EA is not a comprehensive system of income maintenance, but rather a program designed to allow quick ad hoc responses to immediate needs." *Quern v. Mandley, supra,* 436 U.S. at 744, 98 S.Ct. at 2079. The emphasis on immediate response is clearly stated in the legislative history; "[i]ndeed one of the primary purposes of making EA available to persons not receiving or eligible for AFDC was to 'encourag[e] the States to move quickly in family crises, supplying the family promptly with appropriate services, in the hope that this would in many cases preclude the necessity for the family having to go on [AFDC] assistance on a more or less permanent basis.'" *Quern v. Mandley, supra,* 436 U.S. at 744, 98 S.Ct. at 2079, quoting 113 Cong.Rec. 23054 (1967) (remarks of Cong. Mills). As a matter of fact, if a state were to distribute its limited resources over a broad based needy population, as is appropriate in dispensing AFDC benefits, *see, Dandridge v.*

---

**4.** The basic structure of the EA program is set forth in 42 U.S.C. § 606(e):

(e)(1) The term 'emergency assistance to needy families with children' means any of the following, furnished for a period not in excess of 30 days in any 12-month period, in the case of a needy child under the age of 21 who is (or, within such period as may be specified by the Secretary, has been) living with any of the relatives specified in subsection (a)(1) of this section in a place of residence maintained by one or more of such relatives as his or their own home, but only where such child is without available resources, the payments, care or services involved are necessary to avoid destitution of such child or to provide living arrangements in a home for such child, and such destitution or need for living arrangements did not arise because such child or relative refused with-

out good cause to accept employment or training for employment—

(A) money payments, payments in kind, or such other payments as the State agency may specify with respect to, or medical care or any other type of remedial care recognized under State law on behalf of, such child or any other member of the household in which he is living,

(B) such services as may be specified by the Secretary: but only with respect to a State whose State plan approved under section 602 of this title includes provision for such assistance.

(2) Emergency assistance as authorized under paragraph (1) may be provided under the conditions specified in such paragraph to migrant workers with families in the State or in such part or parts thereof as the State shall designate.

*Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969), it would "fundamentally misconceiv[e] the purpose of the EA program." *Quern v. Mandley, supra,* 436 U.S. at 746, 98 S.Ct. at 2080. "A family that is facing destitution because its home has been burned down is not helped at all by a 'moderate' grant insufficient to see it through the crisis." *Id.* In sum, EA "was designed 'to assure needed care for children, to focus maximum effort on self-support by families, and to provide *more flexible and appropriate tools to accomplish these objectives.*'" *Quern v. Mandley, supra,* 436 U.S. at 744, 98 S.Ct. at 2079, *quoting* S.Rep.No. 744, 90th Cong., 1st Sess. 165 (1967), U.S.Code Cong. & Admin.News 1967, p. 2834.

### B. The State Program

In 1968, in order to take advantage of federal funding, New York enacted the predecessor to the present emergency aid statute, Section 350–j NYSSL, New York Laws of 1968, Chapter 992, Section 1.[5] In assessing the legislative intent of the statute, the New York Court of Appeals concluded that it "comports with that expressed in the [federal legislative history]." *Baumes v. Lavine,* 38 N.Y.2d 296, 303, 379

N.Y.S.2d 760, 766, 342 N.E.2d 543, 547 (1975). The statute established basic criteria for eligibility, which were then modified by the regulations promulgated thereunder. Most relevant to this lawsuit is a 1969 regulation which stated, "emergency assistance shall not be provided when destitution is due to loss, theft or diversion of a grant already made." 18 NYCRR 372.2[c]. A class of potential emergency aid recipients instituted an Article 78 proceeding in the New York courts challenging the regulation on the grounds that it conflicted with NYSSL 350–j and with the federal statutory provision, 42 U.S.C. § 606(e). The New York Court of Appeals affirmed a lower court decision which concluded that the provision was invalid. *Jones v. Berman,* 37 N.Y.2d 42, 371 N.Y.S.2d 422, 332 N.E.2d 303 (1975). Recognizing that the intent of the Commissioner may have been "to reduce or eliminate fraudulent claims that could easily be alleged and rarely disproven," 37 N.Y.2d at 52, 371 N.Y.S.2d at 428–29, 332 N.E.2d at 308, the court nonetheless struck down the regulation on the ground that the agency was bound to "promulgate rules to further the implementation of the law as it exist[s]; . . . by adding a requirement not found in the existing State statute, the regulation as presently written is invalid." *Jones v. Berman, supra,* 37 N.Y.2d at 54, 371 N.Y.S.2d at 429, 332 N.E.2d at 308.

---

**5.** As originally enacted, the statute read in relevant part as follows:

§ 350–j. Emergency assistance to needy families with children

1. Any inconsistent provisions of this chapter or of any other law notwithstanding, so long as federal aid is available therefor, a social services district shall provide emergency assistance as herein defined to persons eligible, including migrant workers with families.

2. The term "emergency assistance" means aid, care and services furnished for a period not in excess of thirty days in any twelve month period, in the case of a needy child under the age of twenty-one who is living with a person related to him by blood, marriage or adoption who is eligible to receive aid to dependent children on his behalf pursuant to this chapter and regulations of the department.

3. Emergency assistance to needy families with children shall be provided in accordance with the regulations of the department for children who are without available resources, and when such assistance is necessary to avoid destitution or to provide them with living arrangements in a home, and such destitution or such need did not arise because such children or relatives refused without good cause to accept employment or training for employment.

4. Such department regulations may make provision for aid to be provided under this section in appropriate cases, when grants for aid to dependent children have been discontinued and fair hearings have been requested.

5. In scheduling fair hearings and investigations concerning applications for emergency assistance pursuant to this section, the department and local social services districts shall give priority to such applications and appeals.

Following this decision the legislature amended NYSSL 350–j to its present form.[6]

Although the legislative history of the amended version of the statute is sparse, available documents provide some insight into the legislative intent. A memorandum in support of the bill reads in relevant part:

> Concerning EAF [Emergency Aid to Families], a number of recent court decisions have interpreted the current EAF statute that any person who can demonstrate 'destitution,' regardless of the cause, can obtain an emergency grant. This proposal would establish in State Law those specific limitations which the State had previously attempted to adopt by regulation. It would clearly delineate those situations of legitimate need arising out of unforeseeable catastrophes for which emergency grants would be available.

A directive from the Department of Social Services to local agencies similarly indicates that the amended provision was intended to statutorily limit the grant of emergency assistance:

> EAF was designed to meet specific emergency needs of families with children and not to supplement public assistance grants to ADC and HR[7] recipients. Recent court decisions . . . have expanded the availability of assistance under the EAF program. The court held that the availability of EAF Assistance may be limited by statute; however, the Department had attempted to limit the scope of EAF Assistance through regulations without statutory authority. This new law limits the scope of EAF.

And finally, an affidavit of John Hickey, Director, Income Support Unit, Division of Income Maintenance, New York State Department of Social Services, adds, in pertinent part: ˙

The intent of Section 350–j of the Social Services Law as enacted in 1968 was to take advantage of Federal funds to respond to emergency situations. The statute was not intended to serve as a supplement to the public assistance grant nor serve as an insurance policy in the event a public assistance grant was lost, stolen, or mismanaged. Accordingly, 18 NYCRR 372.2 was amended to prohibit the granting of emergency assistance when destitution was due to loss, theft or diversion of a grant already made. A copy of the amended regulation was duly submitted to the Department of Health, Education and Welfare for their approval and was duly approved on May 22, 1973.

The New York State Court of Appeals thereafter, in the case of *Jones v. Berman*, 37 N.Y.2d 42 [371 N.Y.2d 422, 332 N.E.2d 303] (1975), held that this regulation was not authorized by Section 350–j of the Social Services Law.

The New York Legislature was concerned about the impact of the *Jones* decision since conceivably any family with children facing a risk of destitution would possibly be entitled to some assistance under that decision even though that family had previously received a grant of public assistance. The possible Legislative avenues of approach would be to repeal Section 350–j of the Social Services Law, or limit the amount of assistance that could be provided a particular family. Neither approach appeared attractive, thus, the Legislature amended Social Services Law 350–j to 'override' the *Jones* decision and to accomplish by statute what the Department had done by regulation.

The Legislature was particularly concerned that public assistance recipients would exploit the *Jones* decision to seek

---

**6.** See note 1, *supra*.

**7.** The HR, or Home Relief program is "New York State's residual public assistance program. It is intended to provide a subsistence level of income to those of the state's needy who are ineligible to participate in the categorical welfare program such as . . . AFDC.

Recipients of Home Relief are characteristically needy adults and children in two-parent families." *Roundtree v. Berger*, 420 F.Supp. 282, 286–87 (E.D.N.Y.1976) (three-judge court) Weinstein, J., dissenting). The HR program is entirely state funded. See 63A N.Y.Jur. § 229 at p. 543.

replacement of lost or stolen cash since it is impossible to verify a claim that cash has been lost or stolen. Replacement of public assistance grants in such circumstances would be costly and would discourage recipients from becoming self-reliant.[8]

The plaintiffs in the instant action each received a regular monthly assistance check, cashed it, and after having made some purchases, either lost the remaining cash or were victims of a theft. They each reported their losses to the police, and then applied to the local social services agency for an additional grant. Citing the statute, the agency responded that the applicant did not qualify for emergency assistance because emergency grants could not be issued to replace public assistance monies which had been lost or stolen. Thereafter, plaintiffs instituted this action asserting, *inter alia*, that the challenged provisions create "arbitrary and irrational classifications in relation to the purposes of the Emergency Assistance Program, in violation of the Equal Protection and Due Process Clauses . . . ."

### III Discussion

In evaluating a statutory scheme for providing welfare benefits, this court is guided by the principles established in *Dandridge v. Williams, supra,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 240, 55 L.Ed. 369. 'The problems of government are practical ones and may

justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

*Id.* at 485, 90 S.Ct. at 1161.

The Court has reaffirmed these principles in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 24, 57, 45 L.Ed.2d 522 (1975) and *Califano v. Aznavorian,* 439 U.S. 170, 99 S.Ct. 471, 58 L.Ed.2d 435 (1978). *See also Termini v. Califano,* 611 F.2d 367 (2d Cir. 1979); *Clayborne v. Califano,* 603 F.2d 372 (2d Cir. 1979). Although the enunciated standard gives the legislature considerable latitude in enacting laws to correct perceived social ills, "the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose." *Maher v. Roe,* 432 U.S. 464, 470, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977), *quoting San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

■ Before measuring each challenged provision of Section 350–j against this standard, the court will consider the overriding concerns of the state legislature. First, because the statute provides no ceiling on the amount of aid an eligible family can receive, there is potential for unlimited demand on New York's limited welfare budget.[9] *Cf. Kozinski v. Schmidt,* 436 F.Supp. 201 (E.D.Wisc.1977), discussed at n. 11, *infra,* (ceiling on aid of $150.00 per family). Although policy considerations support aid in any amount appropriate to meet the family's needs, the legislature was nevertheless aware of competing budgetary considerations. Second, administrative efficiency was an important goal. An emergency, by definition, requires an immediate response,

---

**8.** This affidavit was submitted to the court in support of defendants' renewed motion for summary judgment following the remand from the Second Circuit.

**9.** Emergency aid may be provided "to the extent of items of need and services set forth in sections one hundred thirty-one-a." See NYSSL § 350–j(3).

and therefore the state is required to make a speedy determination on a claim without the benefit of the usual investigative techniques. Furthermore, investigating claims is a costly procedure, with administrative expenses depleting the program's budget and diminishing the amount of aid available to claimants. And finally, the legislature was aware of the potential for abuse presented by the possibility of spurious claims. Each of these concerns: 1) that of competing demands on limited resources, 2) that of administrative convenience and 3) that of avoiding spurious claims has frequently been acknowledged as subjects of legitimate state interest. Budgetary considerations clearly supported a welfare classification in *Dandridge v. Williams, supra.* The Court held a state statute reasonable although it resulted in proportionately less aid being distributed to larger families. The court explicitly recognized that there were competing demands on Maryland's welfare budget in rejecting plaintiff's equal protection claim. *See also, Maher v. Roe, supra,* 432 U.S. at 479, 97 S.Ct. at 2385. While a statutory scheme cannot be supported merely on a showing of budgetary considerations if it results in invidious discrimination, the state's interest in preserving the integrity of its welfare budget is particularly persuasive in this case, where the state is providing additional assistance to welfare recipients whose basic needs have already been met in regular monthly public assistance grants under NYSSL § 131–a. See *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Hagans v. Berger,* 536 F.2d 525 (2d Cir. 1976); *Baumes v. Lavine,* 38 N.Y.2d 296, 379 N.Y.S.2d 760, 342 N.E.2d 543 (1975).

As to the second interest, administrative convenience, the Supreme Court has frequently recognized that "efficacious administration of governmental programs is not without some importance," *Frontiero v. Richardson,* 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1973), although this rationale cannot support arbitrary and irrational classifications, nor survive strict judicial scrutiny. *Id.* However, in the instant case, there is a compelling need for efficiency since delay in investigating and processing claims could result in the very destitution which the statute is aimed at avoiding.

The third state interest, that of avoiding spurious claims, is the one most vigorously advanced by the state in support of the challenged classifications. There can be no denying that a state has a legitimate interest in avoiding spurious claims for welfare benefits. See *Jimenez v. Weinberger,* 417 U.S. 628, 636, 94 S.Ct. 2496, 2501, 41 L.Ed.2d 363 (1973); *Shapiro v. Thompson,* 394 U.S. 618, 637, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969). However, as the Court held in *Jimenez,* a classification must be "reasonably related to the prevention of spurious claims" in order to withstand even the minimal scrutiny afforded welfare statutes. *Id.,* 417 U.S. at 636, 94 S.Ct. at 2501. When "the potential for spurious claims is exactly the same as to both subclasses," *id.,* the statute is unreasonable.

In evaluating plaintiff's equal protection claim, the court must consider each of the challenged sections of the statute *in seriatim* to determine whether the classification will reasonably advance the legislative purposes of providing for the efficient and speedy distribution of emergency aid to needy families who file legitimate claims, while avoiding the payment of spurious claims.

### § 350–j(2)(c)—Denial of cash emergency assistance to applicants eligible for AFDC.

Section 350–j(2)(c) states that applications for cash assistance will be considered only if "such child or such household is not categorically eligible for or receiving aid to dependent children." The effect of this provision is to restrict AFDC recipients to emergency service grants while permitting other claimants to receive emergency grants in the form of either cash or services or both. The state has offered no justification for this specific section in its brief, or in response to the court's inquiry. The court's independent research indicates that a conceivable justification for this provision

may be found in a directive from the New York State Department of Social Services to local agencies eight days after the amended statute took effect. This directive explains that:

> ADC [AFDC] families will be ineligible for EAF in the form of cash grants since specific emergency *cash* needs can be met through the regular ADC program. EAF will be utilized to meet the same specific emergency needs for HR families with children. EAF *services* will be available to both ADC and HR families [as will] special fuel grants. [emphasis added]

Notwithstanding the directive's explanation that AFDC families do not qualify for cash emergency assistance because they are eligible for emergency cash benefits "through the regular ADC [AFDC] program," the state has been unable to offer, and this court has been unable to locate any support within New York's AFDC program for this explanation. Although the question of the state's evidentiary burden in seeking to uphold a statutory classification is one on which there is disagreement; see *Weinberger v. Salfi, supra,* 422 U.S. at 803, 95 S.Ct. at 2485 (Brenner, J., dissenting); *Jimenez v. Weinberger, supra,* 417 U.S. at 640, 94 S.Ct. at 2503 (Rehnquist, J., dissenting), the court nevertheless declines to uphold a classification which clearly discriminates against AFDC recipients without any substantiation for the only justification discovered to support it. The court is unaware of any statute or regulation which provides cash emergency aid solely to AFDC recipients.

This court previously stated in analyzing this same section:

> Since the classification under attack limits its automatic denial of emergency assistance in the form of cash only to these applicants eligible for AFDC, this court need not determine whether the state could permissibly deny cash emergency assistance to *all* families applying for it.

*Bacon v. Toia, supra,* 437 F.Supp. at 1385. This court still need not decide this ques-

tion, nor the question of whether the section would be constitutional if there *were* available alternative sources for emergency cash aid for AFDC recipients as the state contends. Although "any state of facts reasonably may be conceived to justify [the provision]", *McGowan v. Maryland, supra,* 366 U.S. at 426, 81 S.Ct. at 1105, 6 L.Ed.2d 393, this court declines to speculate as to what legitimate state purpose would be advanced. While the court recognizes the presumption that legislatures "have acted constitutionally, even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent," *McDonald v. Bd. of Elections,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), the court is also guided by the principle that "the state purpose upholding a statutory class [must be] legitimate and nonillusory." *McGinnis v. Royster,* 410 U.S. 263, 276, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973). The court holds that § 350–j(2)(c) is unconstitutional on the ground that it arbitrarily denies emergency aid in the form of cash to one category of potential beneficiaries of the statute without any demonstration that the resulting classification advances a legitimate, articulated state purpose.

*§ 350–j(2)(e)—Denial of emergency assistance in all cases of loss, theft or mismanagement [10] of a public assistance grant.*

Section 350–j(2)(e) provides that a family is eligible for emergency assistance in cases in which the emergency "could not have been foreseen by the applicant, was not under his control and, in the case of a person receiving public assistance, did not result from the loss, theft or mismanagement of a regular public assistance grant." Thus, this subsection denies emergency assistance to all welfare recipients who face destitution as a result of the loss or theft of the proceeds of a public assistance grant while it grants emergency assistance to welfare recipients whose needs arise from

---

**10.** This court found in its prior decision that none of the plaintiffs requested emergency aid as a result of mismanagement of their welfare checks, and therefore the court declined to review that provision. The court adheres to that position now.

any other catastrophic occurrence. The statute also gives non-welfare recipients who are the victims of loss, or theft of cash an opportunity to document their losses. As the legislative history indicates, this subsection was enacted to override the *Jones* decision and to prevent duplicate payments to public welfare recipients who might feign the loss or theft of the proceeds of a grant. See *Hickey* Aff., *supra.* The court finds that the statute rationally carries out this legislative purpose.

First, it is reasonable to conclude that proving the theft or loss of cash is, if not impossible, nearly impossible. Furthermore, because the proof is elusive, the investigation of such claims is expensive and time consuming. While it is true, as plaintiffs assert, that the classification is both over-inclusive and under-inclusive in that it excludes even those with legitimate claims from submitting proof while permitting proof of potentially spurious claims, this argument is to no avail. As the Supreme Court stated in *Weinberger v. Salfi, supra,* 422 U.S. at 777, 95 S.Ct. at 2472:

> the question raised is not whether a statutory provision precisely filters out those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provi-

sions, and would be directly contrary to our holding in *Mourning* [*v. Family Publications Service, Inc.,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973),] *supra.* Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

Plaintiffs also suggest that there are less drastic means for eliminating spurious claims, including verification upon individual determination and recouping fraudulently obtained benefits from future welfare grants. Neither suggestion presents a viable alternative to the present scheme for carrying out the legislative purpose of preventing spurious claims, because both assume that evidence supporting or corroborating the claim is available. As the state has observed, claims of lost or stolen cash are almost always impossible to verify.[11]

---

11. *Morgan v. Maher,* 449 F.Supp. 229 (D.Conn. 1978), cited by plaintiffs, is inapposite. Plaintiffs in that case challenged state procedures for replacing lost or stolen welfare checks, not the *proceeds* from the checks as in the instant case. It is easier to verify a claim of a lost or stolen check, as is apparent from the procedures instituted for that purpose by the state of Connecticut, *see id.* at p. 230, and therefore the court's observation that "[t]here is little indication that fraud is a frequent occurrence," is clearly irrelevant to the analysis of this case.

In *Burrell v. Norton,* 384 F.Supp. 339 (D.C. Conn.1974), plaintiff challenged a state regulation which authorized emergency aid for replacement of furniture, clothing and other essential items to claimants whose loss occurred as a result of certain catastrophic events only; such as fire or flood. Plaintiff alleged that she was the victim of a theft while hospitalized and sought emergency assistance under the regulation to replace stolen or vandalized household items. The court relying on the Supreme Court's reasoning in *Jimenez v. Weinberger,*

*supra,* rejected the state's argument that the regulation served to limit fraudulent claims, concluding that the classification was both over and under inclusive and not rationally related to any legitimate state interest. While this court declines to speculate whether the Connecticut court would have reached a different result after *Weinberger v. Salfi, supra,* the district court would have had to consider the Supreme Court's analysis in that case along with *Jimenez.* Furthermore, this court does not agree with the Connecticut court to the extent that it rejected the state's argument that the regulation was rationally related to a legitimate interest in avoiding fraudulent claims. It would appear that the *fact* of a fire or flood is more easily verified, as is the physical evidence of the resulting destitution in many cases. A claim that an item is missing and has been stolen would certainly be difficult to prove.

A similar equal protection challenge was raised in the District Court of Wisconsin in *Kozinski v. Schmidt,* 436 F.Supp. 201 (E.D. Wisc.1977). A state regulation authorized aid

The state's choices may simply be to pay all such claims, or to pay none. The legislature has chosen the latter alternative, and "the Constitution does not empower this court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams, supra*, 397 U.S. at 487, 90 S.Ct. at 1163. Accordingly, the court holds that the state may automatically deny any claim for emergency aid when the impending destitution is alleged to have resulted from the loss or theft of the proceeds of a public assistance grant.

### § 350–j(2)(f)—Denial of emergency assistance to replace or duplicate a recurring public assistance grant.

■ This section denies emergency assistance when it is requested "to replace or duplicate a public assistance grant already made under Section one hundred thirty-one-a of the New York Social Services law." An analysis of this subsection thus requires determining the types of grants made under Section 131–a. This section, and the regulations promulgated thereunder, NYCRR Part 352, establish a state-wide standard of need and level of payment for all public assistance grants. The standard monthly need is determined by considering an individual's "regular recurring monthly needs", including those needs related to the costs of shelter and fuel, *see* § 352.1(a) and (b), as well as the costs of those items enumerated in § 352.1(c):

> . . . for any of such persons who may because of their case circumstances require any of the following items . . furniture and furnishings for the establishment of a home, essential repair of heating equipment, cooking stoves and refrigerators, additional cost of meals for persons unable to prepare meals at home,

replacement of clothing or furniture which has been lost in a fire, flood or other like catastrophe, occupational training, cost of services and supplies already received, miscellaneous shelter costs, day care, homemaker services, housekeeping services, camp fees and payment of life insurance premiums.

In order to limit assistance under § 350–j to specific unforeseeable crisis situations, and to prevent recipients of public assistance from resorting to § 350–j as a source of supplemental income to augment a public assistance grant under § 131–a, subsection (f) prohibits awarding emergency aid in the same amount and calculated on the same standard of need as a grant already made under § 131–a. This hardly means, as plaintiffs argue, that subsection (f) effectively precludes welfare recipients from receiving any emergency assistance. Rather, if a welfare family's circumstances change due to an emergency, as defined in § 350–j, there is nothing in the latter statute to prevent the family from applying for an emergency grant. The clear language of the statute indicates that subsection (f) merely furthers the legitimate legislative purpose of protecting New York's welfare budget by prohibiting duplicate payments to a welfare recipient under two different statutory sections. The only distinction between welfare recipients and non-welfare recipients is that the former cannot receive both a monthly welfare check and an emergency aid grant to cover identical needs. Both groups, however, are eligible for emergency aid, "for such items of need, in such amounts as provided for in Part 352." NYCRR § 372.4. § 350–j(2)(f) thus reasonably carries out the dual legislative intent of permitting emergency aid to self-sustaining families by reference to the same standard of need as welfare recipients, and preserving the welfare budget by avoiding duplicate payments.

---

"in case of fire, flood or natural disaster." 436 F.Supp. at 202. The plaintiffs' situation did not fall within any of these categories and they were denied aid necessary to forestall eviction

and disconnection of utilities. The Wisconsin court upheld the statute on the grounds that the state could select the priorities for the distribution of public aid. *Id.* at 204–05.

*IV Conclusion*

The court enjoins the enforcement of NYSSL § 350–j(2)(c) and grants defendants summary judgment as to that portion of the complaint challenging the remaining sections of the statute. The parties have not briefed the damage issue; however, it is clear that the named plaintiffs, on whose behalf monetary relief was sought, are not entitled to damages in light of the court's conclusion that subsection 2(e), on which the Welfare Department specifically relied in rejecting their claims, is valid. As to the remaining members of the class, to whom benefits will inure as a result of this decision enjoining enforcement of Section (2)(c), plaintiffs have not submitted any damage claims.

Let the parties submit judgment on ten days notice:

1) declaring NYSSL § 350–j(2)(c) unconstitutional and enjoining enforcement of that section;

2) granting defendants' summary judgment as to 350–j(2)(e) and 350–j(2)(f).

So ordered.